UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Opal V. Bate,                                    Case No. 8:10-18159-MGW
                                                 Chapter 7

         Debtor.
_____/


Opal V. Bate,                                    Adv. Pro. No.: 8:10-ap-01289-MGW

         Plaintiff,
vs.

Wells Fargo Bank, N.A.,
_____/


**MEMORANDUM OPINION ON**
**PREEMPTION BY NATIONAL BANK ACT OF**
**FLORIDA CONSUMER COLLECTION PRACTICES ACT**

The National Bank Act[1] preempts state laws that prevent or significantly interfere with

the exercise by national banks of their powers. The Florida Consumer Collection Practices Act[2]

applies generally to all creditors and prohibits inappropriate debt collection practices. It does not

prevent or significantly interfere with the business of banking. Accordingly, for the reasons set

forth below, the Court concludes that the NBA does not preempt the FCCPA.


Procedural Background

         This adversary proceeding was brought by the debtor, Opal Bate ("Debtor"), against

Wells Fargo Bank, N.A. ("Wells Fargo") seeking damages for violation of the automatic stay

under Bankruptcy Code Section 362 and for violations of the FCCPA. Specifically, Count I of

_____

[1] 12 U.S.C. § 1, *et seq.* ("NBA").
[2] Fla. Stat. § 559.55 *et seq.* ("FCCPA").

Debtor's Complaint alleges that Wells Fargo's loan collection activities violated the automatic stay pursuant to 11 U.S.C. § 362(a)(6). The remaining thirty-five counts of the Complaint are based on alleged violations of the FCCPA. Thirty-three of these counts allege that Wells Fargo violated Section 559.72(18), Florida Statutes, by contacting the Debtor after it had knowledge that she was represented by an attorney. In this regard, each of these counts contains the following identical paragraphs:

> That Defendant, Wells Fargo, had knowledge that Plaintiff, Opal Bate, was represented by counsel with respect to the debt and had knowledge of Plaintiff's attorney's name and contact information.[3]

> That the continued communication with Plaintiff, Opal Bate, in an attempt to collect a debt, constitutes a direct violation of Florida Statute § 559.72(18).[4]

In two additional counts, the Debtor alleges that Wells Fargo violated section 559.72(17) by impermissibly contacting the Debtor after 9:00 p.m. and before 8:00 a.m. in attempts to collect the past-due balance on her mortgage loan and that Wells Fargo violated Section 559.72(7) by repeatedly contacting the Debtor in a harassing manner.

Wells Fargo moved to dismiss the Complaint. It argued that the Debtor's allegations in Count I of the Complaint, that Wells Fargo violated the automatic stay, are insufficient to state a claim for relief.  It also claimed that the other thirty-five counts of the Complaint that are based on the FCCPA should be dismissed on the basis that the NBA preempts state laws such as the FCCPA that would otherwise limit the manner and scope by which national banks may service and conduct collection activity with respect to loans made in the course of their banking business.  A pre-trial conference was held on January 18, 2011, where the Court considered the

---

[3] *See*, *e.g.*, Complaint at ¶ 68 (Doc. No. 1).
[4] *See*, *e.g.*, Complaint at ¶ 69 (Doc. No. 1).

Motion to Dismiss and denied the Motion as to Count I.[5]  Therefore, the sole issue before this Court is whether the NBA preempts the FCCPA.

Conclusions of Law

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.SC. § 1334(b).  This is a core proceeding pursuant to 28 U.S.C § 157(O).

The issue before this Court is whether the NBA preempts the FCCPA.  In its Motion to Dismiss, Wells Fargo relies on regulations promulgated by the Office of the Comptroller of the Currency (the "OCC") that clarify the applicability of state law to national banks.[6] Under the relevant federal regulations, state laws that "obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized … lending powers do not apply to national banks."[7] These regulations also specify certain state laws dealing with subjects that are not viewed as being inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers.[8]

The specific areas that are not generally preempted are: contracts, torts, criminal law, rights to collect debts, acquisition and transfer of real property, taxation, zoning, and any other law the effect of which the OCC determines to be incidental to the lending functions of the national bank.[9] While the inclusion within these non-preempted areas of the "rights to collect debts"[10] could be interpreted to support the view that debt collection activities of a national bank

---

[5] Doc. No. 14.

[6] 12 C.F.R. § 7.4008.

[7] 12 C.F.R. § 7.4008(d)(1); 12 C.F.R. § 34.4(a).  *See* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *11–13.

[8] 12 C.F.R. § 7.4008(e); 12 C.F.R. § 34.4(b).

[9] 12 C.F.R. § 7.4008(e)(1)-(8); 12 C.F.R. § 34.4(b)(1)-(8).

[10] 12 C.F.R. § 7.4008(e)(4); 12 C.F.R. § 34.4(b)(5).

do not fall within the scope of the federal preemption, the OCC's interpretive history of the applicable regulations dealing with this issue indicates otherwise.[11] That is, it is clear from this history that the reference in these regulations to the "rights to collect debts" pertains to the "existence of a bank's *right* to recover a debt, not to the means the bank uses to pursue that right."[12] Because the "means" employed by a bank to collect a debt would necessarily bring into play laws limiting the manner in which creditors can collect debts, such as the FCCPA, the OCC's interpretation of its own regulation would support a finding that the NBA preempts the FCCPA and its provisions would not apply to national banks.

Accordingly, it appears then that if the sole guidance for this Court were the preemption regulation and the OCC's interpretive letter, then it would be appropriate to find preemption. But this is not the case when the Court looks to the general principles governing federal preemption and the deference that should be afforded to an agency's proclamation that state debt collection laws are preempted.

A.   Federal Preemption

The Supremacy Clause of Article VI of the Constitution provides that the laws of the United States "shall be the supreme Law of the Land; … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[13] In considering preemption issues under the Supremacy Clause, we start with the assumption that "the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[14] The presumption against preemption applies even in those areas long occupied by

---

[11] *Preemption Final Rule*, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *16; OCC Interpretive Letter # 1082, at 6.
[12] OCC Interpretive Letter # 1082, at 6 (emphasis in original).
[13] U.S. Const. art. VI, cl. 2.
[14] *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1122 (11th Cir. 2004).

federal regulation, and the purpose of Congress is the ultimate touchstone in every preemption case. [15]

Congress's intent to preempt state law may be explicitly stated in the language of a federal statute or it may be implicitly contained in the structure and purpose of the statute.[16] The Supreme Court has identified three types of preemption: express preemption, field preemption, and conflict preemption.[17] Express preemption occurs when Congress has clearly expressed an intention to preempt state law.[18] Field preemption occurs when federal regulation in a legislative field is so pervasive that it can reasonably be inferred that Congress left no room for states to supplement it.[19] Conflict preemption arises under two circumstances.  The first circumstance is when it is physically impossible to comply with both federal and state law.[20]  This has been referred to as "physical impossibility preemption."[21]  The second circumstance is when state law stands as an obstacle to achieving the objectives of the federal law.[22] This type has been referred to as "obstacle preemption."[23]

1.   Express Preemption

In 1819, in the case of *McCulloch v. Maryland*,[24] the Supreme Court held that federal law is supreme over state law with respect to national banking. In 1864, Congress enacted the

---

[15] *Wyeth v. Levine*, 129 S. Ct. 1187, 1194–95 (2009) (declining to accept the argument that the presumption against preemption does not apply because the Federal Government has regulated drug labeling for more than a century).
[16] *Cliff*, 363 F.3d at 1122.
[17] *Id.*
[18] *Id.*
[19] *Id.*
[20] *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982); *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963).
[21] *Wyeth,* 129 S. Ct. at 1209.
[22] *Barnett Bank of Marion Cnty., N.A. v. Nelson*, 517 U.S. 25, 33 (1996); *De la Cuesta*, 458 U.S. at 153.
[23] *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 192 (4th Cir. 2007).
[24] 17 U.S. 316 (1819).

National Bank Act establishing the system of national banking still in place today.[25] The Act vested in nationally chartered banks enumerated powers and "all such incidental powers as shall be necessary to carry on the business of banking."[26] It also vested the OCC with broad rulemaking authority under 12 U.S.C. §§ 93(a) and 371(a).[27]  The NBA however, does not contain a provision preempting state consumer protection laws.  It only contains a provision that requires notice and an opportunity for comment before the OCC issues an opinion letter or interpretive rule concluding that federal law preempts state laws concerning, among other things, consumer protection.[28] Therefore, express preemption is not applicable to this case because Congress, through the NBA, has not clearly expressed its intent to preempt state consumer protection laws.

       2.   Field Preemption

     Field preemption is also inapplicable to this case.  While Congress did not expressly address the NBA's preemption of state laws, it has been an issue since its enactment, and the Supreme Court has repeatedly made clear that federal law shields national banks from unduly burdensome and duplicative state regulation.[29] However, the Supreme Court has also made clear that national banks are subject to state laws of general application in their daily business, to the extent such laws do not conflict with the letter or the general purposes of the NBA.[30] States are permitted to regulate the activity of national banks where doing so does not prevent or significantly interfere with national banks' efficient exercise of any power enumerated under the

---

[25] *Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 11 (2007).

[26] 12 U.S.C. § 24 Seventh.

[27] Under 12 U.S.C. § 371, any national banking association may, "make, … loans or extensions of credit secured by liens on interests in real estate, subject to … such restrictions and requirements as the Comptroller of the Currency may prescribe by regulation or order."

[28] *See* 12 U.S.C. § 43.  The notice and opportunity for comment is also required for state laws concerning community reinvestment, fair lending, or the establishment of intrastate branches.

[29] *Watters*, 550 U.S. at 13–14.

[30] *Id*. at 12.

NBA.[31] Based on the foregoing, this Court is persuaded that Congress did not intend for the NBA or the OCC regulations to occupy the field of national banking to the exclusion of state laws of general application and, therefore, field preemption does not apply.

      3.   Conflict Preemption

      Having concluded that the NBA does not expressly preempt the FCCPA and that the NBA does not occupy the entire field of laws governing the lending activities of national banks, we now turn our attention to conflict preemption.  This part of the preemption analysis presents a more challenging task because the conflict in this case is not between a federal statute and state law, but between an agency's interpretation of its own regulation and state law.

      An agency regulation with the force of law may preempt state law.[32] Whether a federal regulation bears the force of law to preempt state law depends on whether Congress has authorized the agency to preempt state law directly.[33] In such cases, the Supreme Court has consistently held that federal regulations have no less preemptive effect than federal statutes[34] and "the Court has performed its own conflict determination, relying on the substance of state and federal law and not on agency proclamations of pre-emption."[35]  As discussed earlier, Congress has authorized the OCC to make determinations on the preemption of state consumer protection laws. Therefore, the OCC's regulation has the force of law, and this Court is to perform its own conflict determination, relying on the substance of state and federal law.

      As discussed earlier, there are two types of conflict preemption:  1) physical impossibility preemption; and 2) obstacle preemption.  First of all, it would not be physically impossible to

---

[31] *Id.* (citing *Barnett*, 517 U.S. at 32–34).
[32] *Wyeth,* 129 S. Ct. at 1200–01.
[33] *Id.*
[34] *See, e.g.*, *Hillsborough Cnty., Fla. v. Automated Med. Lab., Inc.*, 471 U.S. 707, 713 (1985); *De la Cuesta*, 458 U.S. at 153.
[35] *Wyeth*, 129 S. Ct. at 1201.

comply with the NBA and with the FCCPA, as the statutes are not in direct conflict with each other.[36]  Therefore we are only left to consider obstacle preemption.  Before discussing obstacle preemption, we will address Wells Fargo's argument that the FCCPA conflicts with the express language of the OCC's regulation.

The OCC regulation at issue does not specifically refer to state debt collection laws, and to the knowledge of this Court, the OCC has never interpreted its regulations to mean that the debt collection process is included in the servicing of a loan such that national banks are free from any restrictions such as state debt collection laws.[37]  Wells Fargo relies on the OCC regulations to argue that the FCCPA is preempted by the NBA because it "obstruct[s], impair[s] or condition[s] a national bank's ability to fully exercise its Federally authorized … lending powers"[38] by restricting Wells Fargo's ability to service and participate in its mortgage agreement with the Debtor.[39]  However, the plain language of 12 C.F.R. § 7.4008(d)(2) provides that national banks "*may make non-real estate loans without regard to state law limitations* concerning" among other things, "[t]he terms of credit," including "balance, payments due," "the circumstances under which a loan may be called due," and "[d]isbursement and repayments."[40] Nothing in the FCCPA states that Wells Fargo cannot *make* non-real estate loans; it only requires that national banks, as well as all other debt collectors in Florida, abide by the FCCPA when

---

[36] An example of statutes in direct conflict is if the federal law said, "you must sell insurance," while the state law said, "you may not."  *Barnett*, 517 U.S. at 31.  The NBA does not give instruction to national banks on the process of debt collection.

[37] *But see Lomax v. Bank of Am., N.A.*, 435 B.R. 362, 371 (N.D. W. Va. 2010) (finding that a West Virginia statute prohibiting a debt collector from communicating with a consumer when it appears that he is represented by an attorney is preempted by the NBA because "restricting to whom [a bank] may communicate regarding its mortgage loans implicates the 'processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages' by national banks").

[38] *See* 12 C.F.R. § 7.4008(d).

[39] Motion to Dismiss at 6-10 (Doc. No. 9)

[40] 12 C.F.R. § 7.4008(d)(iv) and (ix) (emphasis added).

attempting to collect debts.  Therefore, 12 C.F.R. § 7.4008 does not "expressly" preempt the FCCPA.

Wells Fargo also contends that the FCCPA is not saved by the OCC regulation's savings clause because as interpreted by the OCC in its interpretive letter, the savings clause's reference to "right to collect debts" is different from the means by which a bank collects its debts.[41]  In other words, state laws regarding national banks' rights to collect debts are not preempted, but state laws regarding debt collection are.  The question for this Court then is what level of deference do we give to the OCC's interpretation of its regulation?

When dealing with the level of deference to be accorded to agency action, case law has developed two levels of deference.  The first and higher level of deference is known as "*Chevron* deference" based on the Supreme Court case of *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*.[42] This level of deference is given "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority."[43]  In such cases, the regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.[44]  The second, and lower deference, is known as *"Skidmore* deference" based on the Supreme Court case of *Skidmore v. Swift & Co.*.[45]  Under this standard, the level of deference accorded to an agency's action depends on the "the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its

---

[41] Motion to Dismiss at 10–11 (Doc. No. 9); s*ee also* 12 C.F.R. § 7.4008(e); OCC Interpretive Letter # 1082, at 6.
[42] 467 U.S. 837 (1984).
[43] *U.S. v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).
[44] *Id*.
[45]  323 U.S. 134 (1944).

consistency with earlier and later pronouncements, and all those factors which give it power to persuade."[46]

Wells Fargo argues that the OCC's interpretive letter should be given *Chevron* deference in accordance with the Supreme Court case of *Auer v. Robbins*.[47]  In *Auer* the Supreme Court held that an agency's interpretation of its own regulation is entitled to *Chevron* deference.[48]  In that case, the Secretary of Labor was given authority to define and delimit the scope of exemption for executive, administrative and professional employees.[49] The Secretary of Labor promulgated a regulation that created a salary-basis test.[50] It later interpreted the test in an *amicus* brief.[51]  The Supreme Court held that "because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling 'unless plainly erroneous or inconsistent with the regulation.'"[52] This case is distinguishable from *Auer*. While the OCC has been given authority to make determinations on the preemption of consumer protection laws, its regulations relevant to this case are not of its own creation, but a codification of "principles of NBA conflict preemption that had percolated through the federal courts over several decades."[53] In its Preemption Final Rule, the OCC stated that the initial proposal for the regulations proposed that "debt collection" be included in the list of state laws generally not preempted.[54] It later changed this to "right to collect debts" to be consistent with

---

[46] *Skidmore*, 323 U.S. at 140. While not controlling in this case, it is noteworthy that *Skidmore* level deference has been incorporated in the new Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). 12 U.S.C. § 25b(b)(5)(A).
[47] 519 U.S. 452 (1997).
[48] *Auer*, 519 U.S. at 457; *Christensen v. Harris Cnty.*, 529 U.S. 576, 588 (2000).
[49] *Auer*, 519 U.S. at 456.
[50] *Id*.
[51] *Id*. at 461.
[52] *Id*.
[53] *Smith v. BAC Homes Loans Serv., LP*, 2011 WL 843937 at *8 (S.D. W. Va. Mar. 11, 2011).
[54] *See* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *15.

the Supreme Court case of *National Bank v. Commonwealth*.[55] Therefore, the OCC's interpretive

letter should not be given *Chevron* deference.

    When an agency is administering its own regulation, the courts have accorded *Skidmore*

deference to the agency action; and the level of deference depends on the "degree of the agency's

care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's

position."[56] This Court recognizes that an agency has "a unique understanding of the statutes

they administer and an attendant ability to make informed determinations about how state

requirements may pose an 'obstacle to the accomplishment and execution of the full purposes

and objectives of Congress,'" but the issue here is one of preemption, and we do not defer to

agency positions, whether formal or informal, on preemption issues because a preemption

determination involves matters more within the expertise of the courts than within the expertise

of the agency.[57] This is especially so when the agency is interpreting Supreme Court precedent,

rather than its own regulations, does not conduct its own conflict analysis, and provides no

significant reasons as to why it has distinguished "rights to collect debts" from the means by

which a bank pursues that right. Also, the OCC's interpretive letter was not subject to notice and

an opportunity for comment as required by 12 U.S.C. § 43, and it is far from clear that the OCC

was making a preemption determination of state debt collection laws in its letter.[58] Therefore, no

---

[55] 76 U.S. 353 (1869); *see* Preemption Final Rule, 23 No. 1 OCC Q.J. 28 (2004) (available at 2004 WL 2360325), at *15 n.60.

[56] *Mead*, 533 U.S. 218, 228 (citing *Skidmore*, 323 U.S. at 140).

[57] *Bankwest Inc. v. Baker*, 411 F.3d 1289, 1300–01 (11th Cir. 2005) (citing *Smiley v. Citibank (South Dakota)*, 517 U.S. 735, 744 (1996)); *see also Nat'l Min. Ass'n v. Sec'y of Labor*, 153 F.3d 1264, 1266 (11th Cir. 1998) (finding that courts do not need to give deference to issues beyond an agency's expertise); *Wyeth*, 129 S. Ct. at 1201 (agency conclusions regarding preemption are not entitled to deference).

[58] The OCC's interpretive letter addresses banks' overdraft practices, and the OCC's comments regarding a bank's "right to collect debts" versus its debt collection activity are contained in a footnote, rather than in the substance of the letter. *See* OCC Interpretive Letter # 1082, at 6 n.12.

deference will be given to the OCC's interpretive letter beyond its explanation that the source of the term "right to collect debts" is *National Bank*.

Indeed, the OCC is correct that *National Bank* expressly uses the phrase, "right to collect their debts," but the OCC did not quote the next sentence in the Supreme Court's opinion, which states: "It is only when the State law *incapacitates* the banks from discharging their duties to the government that it becomes unconstitutional."[59] In the many years that follow, the Supreme Court never changes this view.  This is witnessed in the more recent Supreme Court case on NBA preemption, *Barnett Bank of Marion County, N.A. v. Nelson.*[60]

The Supreme Court first articulated the view that states may regulate national banks so long as doing so "does not prevent or significantly interfere with the exercise by the national bank of its powers" in *Barnett*.[61] The case of *Barnett* involved a statute that was enacted by Congress that granted certain national banks the authority to sell insurance in small towns.[62] Subsequently, Florida enacted a statute that prohibited certain banks from selling most kinds of insurance.[63] After determining that express, field, and physical impossibility preemption did not apply, the Supreme Court discussed obstacle preemption.[64]  The Supreme Court looked to the purpose of the federal statute to determine if the state statute stood as an obstacle to that

---

[59] *National Bank*, 76 U.S. at 362 (emphasis added).

[60] 517 U.S. at 33.

[61] *Id.* This standard is carried over explicitly in Dodd-Frank. Dodd-Frank, § 5136C(b)(1)(B). However, Dodd-Frank does not apply to this case because the actions underlying the Debtor's case predate the effective date of Dodd-Frank. *See* 75 FR 57252-02, 2010 WL 3616738 (F.R.).  Additionally, it does not appear that Dodd-Frank applies to State debt collection laws because by its terms, it refers to "state consumer financial laws." 12 U.S.C. §25b(b)(1).  A State consumer financial law is "a State law that does not directly or indirectly discriminate against national banks and that directly and specifically regulates the manner, content, or terms and conditions of any financial transaction … or any account related thereto, with respect to a consumer. 12 U.S.C. § 25b(a)(2).  State debt collection laws do not directly and specifically regulate the manner, content, or terms and conditions of national banks' mortgages and loans. They prohibit certain practices specifically regarding debt collection.

[62] *Barnett*, 517 U.S. at 28.

[63] *Id.*

[64] *Id.* at 30–32.

purpose.[65]  The Court noted that historically, the interpretations of grants of both enumerated and incidental powers to national banks have been grants of authority not normally limited by, but rather ordinarily preempting, contrary state law.[66] Importantly, the Court found that states may regulate national banks so long as doing so does not prevent or significantly interfere with national banks' exercise of their powers.[67] Ultimately, the Court looked to the intent of Congress and held that the state law was preempted by the NBA because there was no indication that Congress intended to subject the national banks' power to sell insurance to state restriction.[68]

The *Barnett* standard was subsequently applied by the Supreme Court in *Watters v. Wachovia,*[69] a case in which the Supreme Court was faced with the question of whether a national bank's operating subsidiaries are subject to state licensing and auditing agencies.[70] The OCC had promulgated a regulation providing that state law applies to national bank operating subsidiaries to the same extent that those laws apply to parent national banks.[71] This basically preempted the applicability of state laws regarding licensing and auditing agencies to national bank operating subsidiaries. The petitioner in the matter disputed the OCC's promulgation of the regulation and argued that preemption is a legal question for determination by the courts.[72] The Supreme Court disregarded this argument stating that the OCC regulation merely clarified and confirmed what the NBA already conveyed and again looked to the intent of Congress and the purpose of the NBA to make its preemption determination.[73]

---

[65] *Id*. at 31.
[66] *Id*. at 32.
[67] *Id*. at 33.
[68] *Id*. at 35–37.
[69] 550 U.S. at 12.
[70] *Watters*, 550 U.S. at 7.
[71] *Id*. at 14 (citing 12 C.F.R. § 7.4006).
[72] *Id*. at 20.
[73] *Id*. at 21.

In its discussion, the Court stated that: "Federally chartered banks are subject to state laws of general application in their daily business to the extent that such laws do not conflict with the letter or the general purposes of the NBA."[74]  The Court also rearticulated the conflict preemption standard set forth in *Barnett*, that "[s]tates are permitted to regulate the activity of national banks where doing so does not prevent or significantly interfere with the national bank's … exercise of its powers."[75] The Court held that the NBA did preempt the application of certain Michigan laws to national bank operating subsidiaries because they significantly interfered with the business of banking by subjecting national bank operating subsidiaries to multiple audits and surveillance.[76]

Both of the state laws at issue in *Barnett* and *Watters* directly affected a national bank's exercise of its powers.  The Supreme Court in both cases recognized the fact that states do have the ability to regulate national banks, and it focused its preemption analysis on whether the state law prevented or significantly interfered with the national bank's exercise of its powers under the NBA, which is consistent with the Supreme Court's statement in *National Bank*.

B.    Does the FCCPA Prevent or Significantly Interfere with National Banks' Exercise of Their Powers under the NBA?

This then brings us to the last part of the conflict analysis. That is, does the FCCPA stand as an obstacle to achieving the objectives of the NBA?  Or, as applied to the NBA, does the FCCPA prevent or significantly interfere with a national bank's exercise of its powers?[77] In addressing this issue, it is helpful to review the historical development of the laws relating to

---

[74] *Id*. at 11.  The Supreme Court also provided some examples of state laws that national banks are subject to, such as state usury laws and state contract law. *Id*.
[75] *Id*. at 12.
[76] *Id*. at 21.
[77] *Barnett*, 517 U.S. at 33; *Watters*, 550 U.S. at 12.

creditors' "rights to collect debts" since that term was used by the Supreme Court in *National Bank* in 1869.

Following World War II there was an explosion of consumer credit in the United States.[78] With an increase in debts, consumers were faced with the problem of how to pay their debts, and creditors were faced with the problem of how to collect their money. This led to a corresponding problem of an increase in third-party debt collectors representing numerous types of creditors: "hospitals, general retailers, credit unions, colleges, department stores, utilities, banks, commercial or wholesale accounts, medical clinics, and newspapers."[79] The techniques used by creditors and third-party debt collectors ranged from friendly coercion to blatant harassment.[80]

Debtors who were abused by outrageous debt collection practices were left to common-law tort remedies.[81] There has never been a question that the NBA does not preempt such typical common law tort remedies. However, these were for the most part inadequate to redress conduct that, although outrageous, did not fit within any of the traditional common-law tort remedies.[82] Due to the increase in debt collection abuses and the inadequacy of the common-law tort

---

[78] Moss, David A., *The Rise of Consumer Bankr.: Evolution, Revolution, or Both?*, 73 Am. Bankr. L.J. 311, 328–29 (1999).  "Total consumer credit rose from $8.338 billion in 1940 to $56.161 billion in 1960, and then to $157.582 billion in February 1973." Connolly, John M., *Recent Statutes Regulating Debt Collection, or* Nunc, De Minimus Curat Lex, 14 B.C. Indus. & Com. L. Rev. 1274, 1275 n.11 (1972-1973).

[79] *Fair Debt Collection Act:  Hearing on H.R. 29 Before the Subcomm. on Consumer Affairs of the House Comm. on Banking, Finance, and Urban Affairs*, 95th Cong., 1st Sess. 156–57 Act:  (1977).

[80] Carroll, William Richard, *Debt Collection Practices:  The Need for Comprehensive Legislation*, 15 Duq. L. Rev. 97, 98 (1976-1977) (providing examples of collection harassment, which include:  "the use of letters and forms resembling legal notices and court orders; letters and phone calls threatening legal action or the use of physical force; visits and phone calls at inconvenient hours to the debtor, or his friends and relatives; contact with employers asking assistance in collecting the debt; and impersonation of attorneys and legal officers"); *see also* Connolly, *supra* note 78, at 1274 nn.1–6 (providing a list of collection tactics from different cases).

[81] Salt, Terry Jayne, *Fair Debt Collection Practices:  Analysis of Fla. and Fed. Law*, 30 U. Fla. L. R. 892, 894 (1977-1978). Consumers relied on tort theories such as, "defamation, intentional interference with contractual relations, malicious prosecution, abuse of process, invasion of privacy, trespass, false imprisonment, and assault and battery." *Id.* at n.26; *see also* Hurt, Charles E., *Debt Collection Torts*, 67 W. Va. L. Rev. 201 (1964-1965).

[82] Salt, *supra* note 81, at 894 (discussing the harsh burden of proof requirements and nonexistence of general standard of reasonable conduct within traditional tort remedies).

remedies, in the late 60's and early 70's, the states recognized the need for consumer protection

legislation in the area of debt collection. Most states enacted consumer protection laws aimed at

debt collection practices.[83] In Florida the FCCPA was enacted in 1972 to address these very

concerns.[84] In addition, because the state laws were not always effective, especially when

collectors made contact with consumers over state lines,[85] Congress also saw a need for

legislation in the area and enacted the Fair Debt Collection Practices Act ("FDCPA") in 1978.

It is noteworthy that the FDCPA does not preempt state laws dealing with debt collection

and provides that state laws are not inconsistent if they provide the consumer more protection

than the federal law.[86] However, the FDCPA does not apply to collection activity by the actual

creditor as opposed to a debt collection agency.[87] In this respect, the FCCPA complements the

FDCPA by offering protection to consumers where the actual creditor, as opposed to a debt

collection agency, is attempting to collect a debt.[88]  Importantly, it is a law of general

applicability and applies to all creditors, not just national banks.

Wells Fargo argues that the FCCPA affects national banks' lending powers under the

NBA because it "restricts the frequency, procedure, and substance of contacts that are permitted

---

[83] In 1977, a congressional study noted that only thirty-seven states and the District of Columbia had laws regulating debt collectors. H.R. Rep. No. 95-131, at 3 (1977). Of the thirty-eight, only a small number had significant prohibited practices and provide consumers with a private right of remedy. *Id.* Thirteen states had no debt collection laws, and eleven other states had few or no prohibited practices. *Id.*

[84] *See, e.g., Harris v. Beneficial Finance Co. of Jacksonville*, 338 So.2d 196, 200–01 (Fla. 1976) ("The [FCCPA] is a laudable legislative attempt to curb … a series of abuses in the area of debtor-creditor relations").

[85] H.R. Rep. No. 95-131, at 2–3 (1977) (stating that interstate debt collection is a major lawless area and that state laws cannot regulate this area).

[86] *See* 15 U.S.C. § 1692n.

[87] *See* 15 U.S.C. § 1692a. *See also* Schulman, David A., *The Effectiveness of the Fed. Fair Debt Collection Practices Act (FDCPA)*, 2 Bankr. Dev. J. 171, 173 n.19 (1985) (stating that extreme abuses are sometimes not remedied because the FDCPA does not apply to banks, credit unions, loan companies, retailers, and private individuals collecting debts).

[88] *See* Fla. Stat. § 559.72 (providing that "[i]n collecting consumer debts, *no person* shall …") (emphasis added).

between Wells Fargo and its customers regarding customers' loans."[89] This Court disagrees.  The NBA was designed to prevent "[d]iverse and duplicative superintendence of national banks' engagement in the business of banking."[90] The FCCPA has no effect on the "business of banking" as conducted by national banks. Its effect is on the business of debt collection as conducted by creditors in general, not just national banks.

There is no significant regulatory objective that would merit preempting a state law of general applicability that is designed to protect consumers from unscrupulous and egregious activity by debt collectors. The FCCPA may restrict the frequency, procedure, and substance of contacts permitted between Wells Fargo and its customers, but it only does so to the extent of requiring that such collection contacts not be abusive, deceptive or unfair.  Wells Fargo may still make loans.  It may also collect on those loans, but it must abide by the FCCPA when doing so, just as every other debt collector in Florida must do.  Therefore, the FCCPA does not prevent or significantly interfere with Wells Fargo's exercise of its powers under the NBA. Accordingly, the NBA does not preempt the FCCPA.

---

[89] Motion to Dismiss at 7 (Doc. No. 9).
[90] *Watters*, 550 U.S. at 13–14.

For the above reasons, this Court concludes that Wells Fargo's Motion to Dismiss shall be denied by separate order.

**DATED** in Chambers at Tampa, Florida, on ___June 22, 2011_____.

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided via CM/ECF to:

**Robert M Geller, Esq.**
Law Offices of Robert M. Geller, P.A.
Tampa, Florida
Attorney for Debtor

**Fentrice D Driskell, Esq.**
Carlton Fields, P.A.
Tampa, Florida
Attorney for Wells Fargo